# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHN RICHARD TOOMBS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3:14-1145** |
| v. | ) | **Judge Trauger / Knowles** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket No. 14. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket No. 15.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgement on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

Plaintiff protectively filed his application for Disability Insurance Benefits ("DIB") on

1

October 28, 2010,[1] alleging that he had been disabled since April 15, 2009, due to Diabetes, High Blood Pressure, Sleep Apnea, "Anxiety/nerves," Depression, Neuropathy, and Seizures. *See, e.g.,* Docket No. 10, Attachment ("TR"), pp. 54, 102, 134. Plaintiff's application was denied both initially (TR 54) and upon reconsideration (TR 55). Plaintiff subsequently requested (TR 68-69) and received (TR 78) a hearing. Plaintiff's hearing was conducted on September 24, 2012, by Administrative Law Judge ("ALJ") David Ettinger. TR 30-53. Plaintiff and vocational expert ("VE"), Dr. Kenneth Anchor, appeared and testified. *Id.*[2]

On November 9, 2012, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 11-29. Specifically, the ALJ made the following findings of fact:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.    The claimant has not engaged in substantial gainful activity since March 7, 2010, the amended alleged onset date (20 CFR 404.1571 *et seq*.).

3.    The claimant has the following severe impairments: diabetes mellitus, diabetic neuropathy, seizure disorder, general anxiety disorder, major depressive disorder, and post-traumatic stress disorder (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that

---

[1] Plaintiff's application filing date was November 10, 2010. TR 102.

[2] At the hearing, Plaintiff amended his disability onset date to March 7, 2010. TR 14, 33.

the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he cannot climb ladders; cannot more than occasionally climb stairs, balance, stoop, kneel, crouch or crawl; must avoid all exposure to hazardous work environments; is limited to simple repetitive work; cannot maintain attention or concentration for more than two hours without interruption; and cannot have more than frequent interaction with others.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on March 28, 1959 and was 50 years old, which is defined as an individual closely approaching advanced age, on the amended alleged disability onset date (20 CFR 404.1563).

8.      The claimant has limited education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 15, 2009, through the date of this decision (20 CFR 404.1520(g)).

TR 16-24.

On December 31, 2012, Plaintiff timely filed a request for review of the hearing decision.

TR 7-10.  On March 6, 2014, the Appeals Council issued a letter declining to review the case

(TR 1-6), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II.  REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of Record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## III.  CONCLUSIONS OF LAW

### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Comm'r of Soc. Sec.,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner

if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980)).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step

sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[3] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.

---

[3] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred by: (1) failing to properly consider the opinions of his treating physicians; (2) failing to properly consider all of his impairments; (3) failing to perform a function-by-function assessment; (4) relying on GAF scores in making the RFC determination; and (5) improperly evaluating and assessing his credibility. Docket No. 14-1 at 1. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. Docket No. 14 at 1.

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1. Opinions of Treating Physicians

Plaintiff argues that the ALJ failed to properly consider the opinions of his treating physicians and provide the requisite "good reasons" for discounting those opinions. Docket No. 14-1 at 6-8. Plaintiff maintains that the ALJ was required to give reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight," and contends that "the failure to follow the procedural requirements of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (*citing Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007)).

Plaintiff notes that the ALJ rejected Dr. Jordan's August 2010 opinion that Plaintiff's conditions would impair his ability to perform a full day's labor, because that opinion "did not fully list the specific conditions he was referring to and because he did not define 'a full day's labor.'" *Id.* Plaintiff contends this was an improper reason for rejection because "clearly a full day's labor means a full 8-hour workday." *Id.* Plaintiff further contends that, if the ALJ had

questions or concerns regarding the meaning of "a full day's labor," the ALJ should have contacted Dr. Jordan for clarification, because "the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion." *Id.* (*quoting* SSR 96-5p).

Plaintiff also argues that the ALJ erred when he rejected Dr. Azar's December 2010 opinion that Plaintiff would be cleared to perform administrative duties or office work "with a limited number of hours (not to exceed 25 hours a week)," as "[t]he ALJ's only reason for rejecting this opinion was that neither his treatment notes nor the letter itself indicate any reason for the limitation regarding working no more than 25 hours per week." *Id.* Plaintiff contends that this reason is insufficient because Dr. Azar treated "the claimant on multiple occasions and based his opinion on his treating relationship with the claimant." *Id.* Plaintiff again maintains that if the ALJ had questions or concerns regarding the basis for the opined restriction, the ALJ should have contacted Dr. Azar for clarification. *Id.* (*referencing* SSR 96-5p).

Additionally, Plaintiff argues that the ALJ failed to comply with 20 C.F.R. § 404.1527(d) and 20 C.F.R. § 416.927(d), which require the ALJ to apply certain factors in determining what weight to give a treating source's opinion when the ALJ does not give a treating source controlling weight.[4] *Id.* at 9. Plaintiff concludes that because the ALJ did not properly evaluate or accord sufficient weight to his treating physicians' opinions, "the ALJ's decision is not supported by substantial evidence and must be reversed." *Id.* (*citing* 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 250; *Lenon v. Comm'r of Soc. Sec.*, 191 F. Supp. 2d 968 (W.D. Tenn. 2001)).

---

[4] Plaintiff argues that these factors include length of the treatment relationship, support for the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* at 9.

Defendant responds that the ALJ properly considered and weighed the opinion evidence of record.  Docket No. 15 at 14-17.  With regard to Dr. Jordan's opinion at issue, Defendant contends that the ALJ declined to accord it significant weight because Dr. Jordan: (1) failed to specify the condition being treated; (2) failed to define "a full day's labor"; and (3) failed to identify any specific functional limitations or restrictions.  *Id.*  Defendant argues that the ALJ's finding that Dr. Jordan's opinion was not supported by the medical findings or evidence was valid under the Regulations and Sixth Circuit case law.  *Id.* (*citing* 20 C.F.R. § 404.1527; *Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 472 (6th Cir. 2014)).  Defendant also argues that the ALJ was not required to contact Dr. Jordan for clarification, because the duty to clarify or seek additional evidence arises only if the evidence available to the ALJ is inadequate to make a decision.  *Id. (citing White v. Barnhart*, 287 F.3d 903, 908 (10th Cir.  2001); *See also, Poe v. Comm'r*, 2009 WL 2514058 fn 3 (6th Cir. 2009); *citing* 20 C.F.R. § 404.1512(e)). Defendant further argues that Dr. Jordan's opinion that Plaintiff could not work a full day was a finding on the ultimate issue of disability, which is not entitled to special significance, as disability determinations are "the prerogative of the Commissioner."  *Id. (citing* 20 C.F.R. § 404.1527; *Curler*, 561 F. App'x at 472; SSR 96-5p).

With regard to Plaintiff's claim that the ALJ did not articulate good reasons for discounting the opinion of Dr. Azar that Plaintiff was cleared to perform administrative duties not to exceed 25 hours per week, Defendant responds that the ALJ properly discounted this limitation because neither Dr. Azar's treatment notes nor his letter explain why Plaintiff's seizure disorder would limit him to working in an office for no more than 25 hours per week, and

because this restriction was unsupported by, and inconsistent with, the other evidence of record. *Id.* at 16-17.  Defendant notes that the ALJ actually credited Dr. Azar's other findings that were supported by his reports and the evidence.  *Id.* at 16 (*referencing* TR 18, 22).[5]  As to Plaintiff's contention that the ALJ should have contacted Dr. Azar for clarification, Defendant reiterates that the ALJ was not required to contact Dr. Azar because the duty to clarify or seek additional evidence arises only if the evidence available to the ALJ is inadequate to make a decision.  *Id.* Defendant maintains that "disagreeing with a treating physician opinion does not create a duty to re-contact the physician."  *Id.* at 17.

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
> (1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> (2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical

---

[5] Defendant maintains that under *Werner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391-92 (6th Cir. 2004), "[i]t is significant that the ALJ incorporated the findings of Dr. Azar which were supported by Dr. Azar's reports and the evidence of record." Docket No. 15 at 16.

and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. . . .

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. . . .

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

20 CFR § 416.927(d) (emphasis added). *See also* 20 CFR § 404.1527(d).

The ALJ must articulate the reasons underlying his decision to give a medical opinion a specific amount of weight.[6] *See, e.g.,* 20 CFR § 404.1527(d); *Allen*, 561 F.3d at 646; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The reasons must be supported by the evidence and "must be sufficiently specific so as to make clear to any subsequent reviewers the weight the ALJ gave to the treating source medical opinion and the reasons for that weight. SSR 96-2p.

---

[6] There are circumstances when an ALJ's failure to articulate good reasons for the weight accorded to medical opinions may constitute harmless error: (1) if a treating source opinion is so patently deficient that the ALJ could not possibly credit it; (2) if the ALJ adopts the opinion or makes findings consistent with the opinion; and/or (3) if the ALJ has complied with the goal of 20 C.F.R. §1527(d), by analyzing the physician's contradictory opinions or by analyzing other opinions of record. *See, e.g., Friend v. Commissioner*, 375 Fed. Appx. 543, 551 (6th Cir. April 28, 2010); *Nelson v. Commissioner*, 195 Fed. Appx. 462, 470-72 (6th Cir. 2006); *Hall v. Commissioner*, 148 Fed. Appx. 456, 464 (6th Cir. 2006).

The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 CFR § 404.1502.

The Sixth Circuit has held that, "provided that they are based on sufficient medical data, the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002) (*quoting Harris v. Heckler*, 756 F.3d 431, 435 (6th Cir. 1985)). The ALJ is not bound to accept the findings of a treating physician, however, if those findings are based on insufficient clinical evidence or are inconsistent with other evidence in the record. *Combs v. Comm'r of Soc. Sec.,* 459 F.3d at 652 (6th Cir. 2006) (*citing Bogal v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993)); 20 CFR § 416.927(d); 20 CFR § 404.1527(d). If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

Regarding an ALJ's responsibility to contact a physician for clarification of an opinion, the Sixth Circuit has held that "an ALJ is required to re-contact a treating physician only when the information received is inadequate to reach a determination on claimant's disability status." *Poe*, 342 F. App'x at 156 n. 3. An ALJ is not required to re-contact a physician when the ALJ rejects the limitations recommended by that physician. *Id.*

In determining the weight to be accorded to the opinion evidence, the ALJ in the instant action discussed the medical and opinion evidence of record (physical) in pertinent part as

follows:

>The medical evidence of record is consistent with my findings. Medical records from Dickson Medical Associates confirm diagnoses concerning the claimant of acute bronchitis, shortness of breath, hypertension, obesity, anxiety, and depression. (Exhibit 3F, pp. 6, 13, and 18). Treatment notes indicate that on December 12, 2008 the claimant had developed an abscess in the abdominal wall, which required packing. (Exhibit 3F, p8). In April, 2009, the claimant was seen by a primary care physician for the onset of high blood pressure, (Exhibit 8F, p.8). He had a history of alcohol and cigarette usage, and had lost a job during this period. At this time the claimant's blood pressure was 165/95. His blood pressure remained controlled through September 2009, but he continued to smoke cigarettes. In March 2010, the claimant presented to the Veterans Affairs hospital with complaints of a tight chest and a headache. He was also diagnosed as hyperglycemeic. (*Id.*).

>The claimant presented to the emergency department after an alleged epileptic episode on July 27, 2010. (Exhibit 11F, p. 112). This episode was not witnessed. After the episode, the claimant reported tightness across chest [*sic*] with a twisting sensation in the right chest that lasted for about one to two minutes. He was concerned about tightness rather than the episode that morning. As a result, the tightness across his chest prompted the emergency room visit. His vitals were as follows: blood pressure–120/80; temperature-99.2; and oxygen levels on room air: 97%. On physical examination, the claimant was awake and alert, all extremities normal, and grip strength intact. The impression was post-tussive syncope, followed by chest pain without evidence of acute cardiac ischemia. The findings on EKG and labs did not rule out cardiac disease for a lifetime, but that was no evidence of acute myocardial infarction at this point. (*Id.*).

>. . .

>In a letter dated August 31, 2010, Dr. Jordan stated that the claimant was presently under his care and "being treated for a medical condition, which impairs his ability to perform a full days' labor." (Exhibit 5F). On September 20, 2010, Darryl L. Jordan, M.D., performed a diabetic foot examination for the claimant. (Exhibit 11F, p. 97). Dr. Jordan administered this test based upon

the claimant's complaint of numbness in his feet. The results were normal in both feet for the visual exam, sensation and pulse. (*Id*.). Concerning an MRI of the claimant's brain taken on October 11, 2010, although there was trace mucosal thickening of the left maxillary atrium, the impression overall was normal. (Exhibit 18F, p.19)

On December 16, 2010, Nabil J. Azar, M.D., wrote a letter at the request of the claimant stating that the claimant followed up in the neurology clinic for epilepsy and that his seizures had not been completely controlled with medications. (Exhibit 5F, p.3). Based upon the claimant's medical condition, Dr. Azar further noted that the following restrictions would apply until the claimant becomes seizure-free for at least six consecutive months: no driving, no using heavy machines, no working on heights, no working close to fires, and no bathing or swimming alone. On the other hand, Dr. Azar also expressed that the claimant was clear to perform administrative duties or office work with a limited number of hours not to exceed 25 hours per week. (*Id.*).

. . .

S. Lerman, M.D. completed the claimant's physical residual functional capacity assessment on January 28, 2011. (Exhibit 8F). As for work-related limitations, Dr. Lerman indicated that the claimant retains the capacity to occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; for any given eight-hour workday, stand, walk and sit for six hours. (*Id.,* at 2). As for postural limitations, the claimant can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes or scaffolds. (*Id.*, at 3). Concerning nonexertaional limitations, the claimant should avoid concentrated exposure to hazards (machinery, heights, etc.) due to seizure precautions. Although the claimant has medically determinable impairments, the allegations are not fully supported by findings. (*Id.*, at 6).

. . .

On May 9, 2011, Thomas E. Thrush, M.D., affirmed the residual functional capacity assessment proposed by Dr. Lerman on January 28, 2011 as there was not medical evidence that the claimant's symptoms had worsened or that there was change in the claimant's

ability to work. (Exhibit 15F). . . .

TR 18-20 (*citing* TR 220, 222, 227, 232, 557-59, 564, 587, 592-95, 692, 702, 707, 852-55, 859, 1041).

Drs. Jordan and Azar were Plaintiff's treating physicians, a fact that would justify the ALJ according greater weight to their opinions than to others, as long as their opinions were supported by medically acceptable clinical and laboratory diagnostic techniques, and consistent with the evidence of record. With regard to the weight the ALJ accorded to the physician opinion evidence and the reasons therefor, the ALJ stated:

> As for the opinion evidence, I cannot give significant weight to the letter written by Dr. Jordan because he fails to specify the condition being treated, fails to define "a full day's labor", and fails to identify any specific functional limitations. For example, Dr. Jordan wrote to whom it may concern that: "He [the claimant] is presently being treated for a medical condition, which impairs his ability to perform a full day's labor."

> On December 15, 2010, Dr. Azar wrote to whom it may concern that the claimant is treated for epilepsy and must avoid all hazards until he has been seizure free for six months. (Exhibit 5F). I accept that opinion and have incorporated it into my residual functional capacity finding. Dr. Azar adds: "On the other hand, Mr. Toombs is cleared to perform administrative duties or office work with a limited number of hours (not to exceed 25 hours a week)." Neither treatment notes nor the letter for Dr. Azar indicate any reason why the claimant's seizure disorder would limit him to office work or to working no more than 25 hours per week. As a result, I do not accept these additional restrictions.

> I accept the opinions of the state agency medical consultants and the consulting psychologist regarding the claimant's limitations because they are well explained and consistent with the claimant's treatment records. (Exhibits 7F, 8F, 10F, 13F and 15F).

TR 22 (*citing* TR 557-59, 564, 592-95, 852-55, 859).

16

As can be seen, the ALJ determined that Dr. Jordan's opinion and part of Dr. Azar's opinion were vague, insufficiently supported by the record, and inconsistent with other opinions in the record; he therefore chose not to accord their opinions significant weight. TR 19-20, 22. As noted, the ALJ does not have to accept the opinion of a treating physician if that physician's findings are based on insufficient evidence or are in conflict with other substantial evidence in the record. *Combs*, 459 F.3d at 652 (*citing Bogal*, 998 F.2d at 347-48; 20 CFR §§ 404.1527(d)(2), 416.927(d)(2)). When opinions are inconsistent with each other or parts of the opinions are insufficiently supported, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 CFR § 416.927(e)(2). As such, the Regulations do not mandate that the ALJ accord either Dr. Jordan's or Dr. Azar's evaluation controlling weight.

With regard to Plaintiff's argument that the ALJ should have contacted Dr. Jordan and Dr. Azar for clarification regarding the reasoning for their opined limitations, the ALJ was not required to contact Dr. Jordan and Dr. Azar for the reasons that follow. First, Plaintiff has the burden of proving he is disabled. *Ferguson*, 628 F.3d at 275 (*citing Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001)). Second, the ALJ has discretion to determine whether additional evidence is necessary to make the disability determination. *Id.* Third, the duty to clarify or seek additional evidence arises only if the evidence available to the ALJ is inadequate to make a decision. *See Poe*, *supra*, *citing* 20 C.F.R. § 404.1512(e). As has been demonstrated, the ALJ in the case at bar considered the evidence of record, reached a reasoned decision, and explained the basis therefor. The ALJ had sufficient evidence upon which to base his decision; therefore, he

did not need to contact Drs. Jordan and Azar to seek clarification or obtain additional evidence, and Plaintiff's argument on this point fails.

## 2. Consideration of Plaintiff's Impairments

Plaintiff argues that the ALJ failed to properly consider all of his impairments. *Id.* Specifically, Plaintiff contends that the ALJ failed to "sufficiently state" why he did not find Plaintiff's obstructive sleep apnea, insomnia, and cough syncope to be severe. *Id.* at 9. Plaintiff argues that these impairments are diagnosed and documented in the record, cause additional limitations which affect his ability to work, and more than slightly affect his ability to function. *Id.* Plaintiff asserts that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience," such that the "ALJ's failure to properly consider these impairments was insufficient and unjustifiable." *Id.* at 9-10 (*citing Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)).

Defendant responds that the "ALJ discussed Plaintiff's impairments and properly determined which of his impairments were severe." Docket No. 15 at 4. Defendant notes that the ALJ mentioned, *inter alia*, that Plaintiff's obstructive sleep apnea and sleeping difficulties were being treated with Zolpidem and Lorazepam, and that Plaintiff had been diagnosed with "post-tussive syncope." *Id.* at 5 (*citing* TR 16, 19). Defendant argues that Plaintiff did not indicate what specific additional limitations were caused by these impairments or produce evidence to support his assertions, and therefore did not meet his burden of demonstrating that his sleep apnea, insomnia, and cough syncope were severe impairments. *Id.* at 4-5. Defendant also notes that "no doctor opined that Plaintiff had specific limitations due to these impairments."

18

*Id.* at 4. Defendant maintains that "the ALJ did not err when he failed to find these impairments to be severe impairments" because "a diagnosis or notation . . . does not, by itself, establish the condition's severity or its effect on a plaintiff's functional limitations." *Id.* (*citing Lyons v. Astrue*, No. 3:10-CV-502, 2012 WL 529587, *1, *4 (E.D. Tenn. Feb. 17, 2012)).

Defendant argues that the ALJ found that Plaintiff had "at least one severe impairment," considered the effect of all of Plaintiff's impairments (both severe and non-severe), and completed the sequential evaluation process, such that even if the ALJ should have found additional severe impairments, that error would be harmless because "[a] non-severe finding is considered harmless error if other severe impairments are found." *Id.* at 6 (*citing Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

At step two of the sequential evaluation process, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 CFR § 404.1520(c). An impairment or combination of impairments is "severe" within the meaning of the Regulations if it significantly limits a claimant's physical or mental ability to perform basic work activities; conversely, an impairment is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities. *Id.*; 20 CFR §§ 404.1521(a), 416.920(c), 416.921(a). The Sixth Circuit has described the severity determination as "a *de minimis* hurdle" in the disability determination process, the goal of which is to screen out groundless claims. *Higgs*, 880 F.2d at 862; *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985).

Where the ALJ finds that the claimant has at least one severe impairment and proceeds to

complete the sequential evaluation process, however, the ALJ's failure to find that another condition is a severe impairment cannot constitute reversible error. *See Maziarz*, 837 F.2d at 244. Additionally, a diagnosis alone does not establish a condition's severity or its effect on a plaintiff's functional limitations, and the plaintiff must offer evidence or arguments showing that a restriction resulting from an impairment requires greater limitations than those found in the ALJ's RFC determination. *Lyons*, 2012 WL 529587 at *4.

Determining a claimant's limitations for purposes of establishing an RFC occurs in steps four and five of the sequential evaluation process and requires consideration of the combined effect of the claimant's impairments: mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B); 20 CFR §§ 404.1520, 404.1545, 416.920. A claimant's RFC is defined as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 CFR Pt. 404, Subpt. P, App. 2 § 200.00(c). With regard to the evaluation of physical abilities in determining a claimant's RFC, the Regulations state:

> When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

20 CFR § 404.1545(b).

At step two of the sequential evaluation process, the ALJ found that Plaintiff had the

following severe impairments: diabetes mellitus, diabetic neuropathy, seizure disorder, general

anxiety disorder, major depressive disorder, and post-traumatic stress disorder.  TR 16.  Also at

step two, the ALJ mentioned Plaintiff's sleep apnea, insomnia, and cough syncope and explained

why he found these impairments not to be severe:

> The claimant has the following severe impairments: diabetes
> mellitus, diabetic neuropathy, seizure disorder, general anxiety
> disorder, major depressive disorder and, post-traumatic stress
> disorder (20 CFR 404.1520(c)).
>
> . . .
>
> The medical evidence of record mentions the claimant's condition
> of obstructive sleep apnea; however, this impairment is not severe.
> The claimant was treated with Zolpidem, and subsequently
> Lorazepam for this condition.  (Exhibit 11F, p. 107).  In addition,
> according to testimony, the Veterans Affairs referred the claimant
> for admission to a sleep clinic on November, 7 2012 where staff
> will study his symptoms.

TR 16  (*citing* TR 702).

After discussing Plaintiff's impairments, both severe and non-severe, the ALJ went on to

complete the five step sequential evaluation process.  As noted above, where the ALJ finds at

least one severe impairment and proceeds to complete the sequential evaluation process, the

ALJ's failure to find that another condition is severe cannot constitute reversible error.  *Maziarz*,

837 F.2d at 244.  Accordingly, Plaintiff's contention on this point fails.

With regard to Plaintiff's argument that, in failing to find these impairments severe, the

ALJ failed to properly consider all of Plaintiff's impairments and their resulting limitations when

determining his RFC, the ALJ, when determining Plaintiff's RFC, referenced Plaintiff's sleep

apnea, insomnia, and cough syncope:

> The impression was post-tussive syncope, followed by chest pain without evidence of acute cardiac ischemia. . . .
>
> On August 26, 2010, the claimant presented to the mental health clinic as a walk-in only for change [*sic*] sleep medication from Zopidem to Lorazepam. (Exhibit 11F, p. 107).

TR 19 (*citing* TR 702, 707).

Moreover, Plaintiff's sleep apnea and cough syncope were also discussed at the hearing:

> Q:    Now when your records talk about these coughing episodes where you lost consciousness, is that the same thing that you've been referring to or is that something different?
>
> A:    On the seizures?
>
> Q:    Your records say that you have coughing episodes where you lose consciousness.
>
> A:    Okay.  It would be seizures, yeah.
>
> . . .
>
> Q:    Now there was a mention of sleep apnea. Are you - - what's the status of your sleep apnea?
>
> A:    I've tried to - - the CPAP, I've tried wearing it - - something happens in my sleep.  Hour, hour and a half, two hours of my sleep and I wake up choking, and then I've put it back on, I've tried it, wake up choking, so I send my chip off and they readjusted things on it.  So still, same thing is still happening, so VA is going to put me in the hospital November, if I'm not mistaken it's November 7th at Hospital, Murfreesboro Sleep clinic where they can monitor everything and try to figure out what is causing me to do that.
>
> Q:    So you've been using the, the machine and - -
>
> A:    I've tried for about two months I've tried and then I quit using it because I couldn't keep on it.

TR 40.

As can be seen, the ALJ was aware of these impairments and Plaintiff's reported limitations therefrom. As long as the ALJ considers all of a claimant's impairments, the failure to find an impairment severe likewise does not constitute reversible error. *See Kirkland v. Comm'r of Soc. Sec.*, 528 Fed.Appx. 425, 427 (6th Cir. 2013); *Maziarz*, 837 F.2d at 244. Plaintiff's argument on this point therefore does not constitute grounds for reversal or remand.

### 3. GAF Scores

Plaintiff argues that "[t]he ALJ erred by relying on GAF scores to determine and rate the severity of the claimant's mental impairments and symptoms." Docket No. 14-1 at 11. Plaintiff contends that ALJ's statements that Plaintiff had been assigned a GAF score over 50 and that a score over 50 equates to moderate difficulty in social and/or occupational functioning was erroneous because: (1) the Commissioner has declined to endorse GAF scores for use in Social Security and SSI disability programs; (2) GAF scores have no direct correlation to the severity requirements of the mental disorders listings; and (3) GAF scores "are not raw medical data and do not necessarily indicate improved symptoms or mental functioning." *Id.* (*citing Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007); 65 Fed. Reg. 50746, 50764-65 (August 21, 2000)). *Id.* (*citing* TR 20). Plaintiff maintains that, because the ALJ should have given greater weight to the treatment notes and Plaintiff's subjective complaints regarding his mental conditions rather than Plaintiff's GAF scores, this action should be remanded for determination of Plaintiff's mental impairments and limitations without consideration of his GAF scores. *Id.*

Concerning Plaintiff's claim that the ALJ improperly considered his GAF scores,

Defendant contends that "while the ALJ may not solely consider GAF scores, the ALJ is entitled to consider GAF scores among the other evidence in the record."  Docket No. 15 at 8 (*citing Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)).  Defendant argues that the ALJ did not rely solely on Plaintiff's GAF scores to determine and rate the severity of Plaintiff's mental impairments, but rather, considered the opinions of Drs. Sweeney and Edwards, as well as the evidence of record as a whole.  *Id.* (*citing* 18, 20-21, 594, 859).  Defendant contends therefore that the ALJ's discussion of Plaintiff's GAF scores was appropriate.  *Id.*

Plaintiff is correct that GAF scores are not determinative of disability for Social Security purposes.  In fact, the Social Security Administration has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs" because a GAF score is not determinative of an individual's RFC, and it has indicated that GAF scores have no "direct correlation to the severity requirements in [the] mental disorders listings." *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746-01 (August 21, 2000).

While an ALJ may not base his RFC determination solely on GAF scores, an ALJ is allowed to consider GAF scores in making the RFC determination, and in fact, is required to consider the record as a whole.  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002).

The ALJ in the instant action discussed Plaintiff's GAF scores, mental opinion evidence, and his evaluation thereof as follows:

> On August 26, 2010, . . . [t]he claimant's current Global
> Assessment of Functioning (GAF) score was assessed at 68,

indicating some mild difficulty in social and or occupational functioning. DSM-IV-TR (2000 text revision).

. . .

On January 11, 2011, the claimant presented to Mark W. Petro, Ph.D., for a psychological consultative examination. (Exhibit 7F). Based upon the evaluation, the claimant demonstrated mild difficulty in his ability to consistently understand and remember complex instructions, and in exhibiting sustained concentration and persistence for making complete decisions in a work environment. (Exhibit 7F, p.5). Dr. Petro also indicated that he might demonstrate mild to moderate difficulty in his ability to persist during workdays without interruption from psychological symptoms and interacting with the public and various personnel within the job setting. Lastly, Dr. Petro noted that the claimant might demonstrate mild difficulty in his ability to take necessary precautions against recognized hazards within the work setting. The claimant's current Global Assessment of Functioning score was assessed at 55, indicating moderate difficulty in social and/or occupational functioning. DSM-IV-TR (2000 text revision). (*Id.*). Dr. Petro's diagnostic impression included major depressive disorder – recurrent in partial remission, alcohol dependence – sustained in full remission, and antisocial personality features. (*Id.*, at 5).

. . .

Rebecca B. Sweeney, Ph.D., documented in the Psychiatric Review Technique form that the claimant has mild and moderate degrees of limitation in the functional domains. Her findings were as follows: restriction of activities of daily living = "mild;" difficulties in maintaining social functioning = "moderate;" difficulties in concentration, persistence and pace = "moderate;" and episodes of decompensation = "none". (Exhibit 9F, p.11). According to Dr. Sweeney, the claimant's allegations could reasonably produce the symptoms and that his impairments result in moderate limits. (*Id.*, at 13). Dr. Sweeny further indicated that the claimant's concentration, persistence, and pace, and social interaction are somewhat impacted by his diagnosis and cause moderate limitations, but most of the mental limitations appeared to be related to the claimant's physical problems.

Rebecca B. Sweeney, Ph.D., completed the mental residual functional capacity assessment of the claimant on February 1, 2011. (Exhibit 10F). Concerning the mental activities of understanding and memory, sustained concentration and persistence, social interaction, and adaption, Dr. Sweeney assessed the claimants in a range from "not significantly limited" to "moderately" limited. (*Id.*). None of the mental activities of the claimant was deemed as "markedly limited." Specifically, Dr. Sweeney documented that the claimant has the ability to understand and remember simple and detailed tasks, but cannot make independent decisions at an executive level; the ability to maintain attention and concentration for periods of at least two hours; the ability to relate appropriately to supervisors and co-workers (can frequently interact with the general public; and adapt to infrequent change. (Exhibit 10F. p.3).

Horace F. Edwards, Ph.D., completed both a Psychiatric Review Technique Form and a mental residual functional capacity assessment for the claimant on April 28, 2011. (Exhibits 12F and 13F). Similarly, Dr. Edwards assessed the claimant in a range from "not significantly limited" to "moderately limited," but with more mental activities deemed as "moderately limited" when compared to Dr. Sweeney's conclusions in the Psychiatric Review Technique Form. Specifically, Dr. Edwards documented in the mental assessment that the claimant can understand, remember and carry out one, two, and three-step instructions; has the ability to sustain attention and concentration for periods of at least two hours in an eight-hour day; can work with and around others, to include the general public with the ability to relate appropriately with peers and supervisors and maintain appropriate social behaviors; and that he can adapt to infrequent workplace changes. (Exhibit 13F., p.3).

On May 9, 2011, Thomas E. Thrush, M.D., affirmed the residual functional capacity assessment proposed by Dr. Lerman on January 28, 2011 as there was no medical evidence that the claimant's symptoms had worsened or that there was a change in the claimant's ability to work. (Exhibit 15F). At his fourth psychotherapy session on November 22, 2011, the claimant was diagnosed with ruminative thoughts, anxiety and depression. (Exhibit 17F, p. 66). After the assessment, Lindsey C. Barzizza, M.S., Psychology Trainee planned to assist the claimant with identifying his irrational beliefs/fears around his current health

status and his fears pertaining to death. Her report was cosigned by Jonathan E. May, Ph.D. (*Id.*).

. . .

The extent of the claimant's allegations of symptoms are [*sic*] inconsistent with the objective medial evidence. First, the claimant denied any inpatient treatment history remarkable for psychological, emotional or behavioral problems. (Exhibit 7F, p.3). During the consultative examination with Dr. Petro, although the claimant endorsed the symptoms of depressed mood, insomnia and fatigue, which date back to when he had stopped working almost two years ago and after finding out his status as a diabetic over four years ago, he demonstrated a good judgment and insight. Dr. Petro also estimated the claimant to be within the average range of intellectual functioning. (*Id.*, at 1). As of November 2011, mental heath staff described the claimant's beliefs concerning his health status as "irrational." (Exhibit 17F, p.66). Lastly, the claimant denies a history of suicidality, delusions or hallucinatory experience, problems with anger or aggression, and homicidal attempts.

I do not fully credit the claimant's testimony because it is inconsistent with his routine and limited medical treatment history. I note for example that the claimant was discharged from mental health treatment on May 31, 2012. . . .

. . .

In sum, the above residual functional capacity assessment is supported by the objective medical evidence, inconsistencies in the claimant's allegations of symptoms with the objective medical evidence, and the claimant's limited psychological treatment history.

TR 19-22 (*citing* 564, 566, 568, 592, 594, 859, 852, 925).

As can be seen, the ALJ did not rely on Plaintiff's GAF scores to determine and rate the severity of Plaintiff's mental impairments and symptoms, nor did he base his mental RFC determination of Plaintiff solely on Plaintiff's GAF scores. Rather, as demonstrated, the ALJ

considered the entirety of the medical and testimonial evidence of record. Because the ALJ did not base his decision on Plaintiff's GAF scores and an ALJ is to consider all evidence in the record, the ALJ properly considered Plaintiff's GAF scores. Plaintiff's argument fails.

## 4. Credibility

Plaintiff argues that the ALJ did not properly evaluate his credibility. Docket No. 14-1 at 12. Specifically, Plaintiff contends that although the ALJ stated that he used the criteria outlined in SSR 96-7p, the ALJ did not satisfy SSR 96-7p because a single, conclusory statement that the criteria have been considered is insufficient when making credibility determinations. *Id.* at 12-13.

Plaintiff also contends that the ALJ improperly evaluated his credibility because he mischaracterized and placed too much emphasis on Plaintiff's "minimal activities." *Id.* Plaintiff argues that the fact that he can perform simple functions does not necessarily indicate that he possesses an ability to engage in substantial gainful activity, because "[s]uch activity is intermittent and not continuous, and is done in spite of the pain suffered." *Id.* (*citing Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967). Plaintiff maintains that a person is disabled if he can "engage in substantial gainful activity only by enduring great pain." *Id.*

Plaintiff further argues that the ALJ should not have discounted his credibility based in part on the fact that he had received unemployment benefits and that while receiving these benefits, he asserted that he was able to work. *Id.* at 13-14 (*referencing* TR 44). Plaintiff argues that discounting his credibility on this basis was erroneous because Plaintiff was not required to apply for jobs while receiving unemployment benefits. *Id.* Plaintiff contends that the ALJ

should have considered that Plaintiff was neither required to pursue a job because of his "unique situation where he simply signed the union hall books," nor was "actively pursuing jobs at that time." *Id.* at 14. Plaintiff contends, therefore, that the ALJ's credibility analysis was flawed and warrants remand. *Id.*

Defendant maintains that the ALJ "provided a number of good reasons" in support of his credibility finding, and therefore, did not rely on a single, conclusory statement. Docket No. 15 at 9. Specifically, Defendant argues that the ALJ explained that he discounted Plaintiff's credibility because of the following: (1) "lack of objective medical evidence"; (2) "leaving work for reasons unrelated to his disability"; (3) "receipt of unemployment benefits"; (4) "activities of daily living"; (5) "conservative treatment"; and (6) "inconsistencies between Plaintiff's statements and other evidence." *Id.* at 9-11 (*citing* TR 15-22).

Regarding Plaintiff's claim that the ALJ placed too much emphasis on his activities of daily living, Defendant maintains that "the ALJ did not find that Plaintiff's activities of daily living demonstrated that he could perform substantial gainful activity," but rather, found only that "Plaintiff's activities demonstrated that he was not as limited as he alleged." *Id.* at 11 (*citing* TR 17). Defendant asserts that the ALJ's consideration of Plaintiff's daily activities was proper because "the ALJ may consider daily activities as one factor in the evaluation of subjective complaints." *Id.* (*citing Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013)).

With respect to Plaintiff's claim that the ALJ should not have discounted his credibility because he received unemployment benefits, Defendant argues that, while receipt of unemployment benefits is not "dispositive evidence," it is "some evidence" that Plaintiff

considered himself able to "do some work long after his onset date." *Id.* at 10-11 (*citing*

*Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir. 1991)). Defendant asserts that "Plaintiff's

testimony affirms the ALJ's finding that he accepted unemployment benefits by acknowledging

that he was capable of working." *Id.* at 11 (*citing* TR 44-45). Defendant further asserts that the

ALJ's appropriately discussed the medical evidence contradicting Plaintiff's claims and

explained his reasons for discounting Plaintiff's credibility, such that the ALJ's credibility

determination was proper. *Id.* at 12-13.

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's subjective

allegations:

> [S]ubjective allegations of disabling symptoms, including pain,
> cannot alone support a finding of disability...[T]here must be
> evidence of an underlying medical condition *and* (1) there must be
> objective medical evidence to confirm the severity of the alleged
> pain arising from the condition *or* (2) the objectively determined
> medical condition must be of a severity which can reasonably be
> expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d

Sess. 24) (Emphasis added); *see also* 20 CFR §§ 404.1529, 416.929 ("[S]tatements about your

pain or other symptoms will not alone establish that you are disabled. . . ."); and *Moon v.*

*Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating

symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the

ALJ's personal observations, and the objective medical evidence contradict each other.").

Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a

debilitating degree that it prevents an individual from engaging in substantial gainful activity."

*Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 CFR § 404.1529(c)(2)). After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531 (*citing Bradley,* 862 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968,

974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)).  If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record (*see King*, 742 F.2d at 975).

Plaintiff correctly states that a claimant's sporadic daily activities may not indicate what a claimant can do on a sustained basis, particularly where the claimant experiences periods of remission and exacerbation.  *See Cohen v. Secretary*, 964 F.2d 524 (6th Cir. 1992).  An ALJ may, however, consider the claimant's household and daily activities when evaluating allegations of pain or ailments. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997). *See also Temples*, 515 F. App'x at 462 (6th Cir. 2013).  The ALJ may also consider a claimant's receipt of unemployment benefits, when considering the evidence of record in its entirety and making a credibility determination.

The ALJ in the instant action ultimately determined:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

TR 21.

The ALJ explained:

> The extent of the claimant's allegations of symptoms are inconsistent with the objective medical evidence.  First, the claimant denied any inpatient treatment history remarkable for psychological, emotional or behavioral problems.  (Exhibit 7F,

32

p.3). During the consultative examination with Dr. Petro, although the claimant endorsed the symptoms of depressed mood, insomnia and fatigue, which date back to when he had stopped working almost two years ago and after finding out his status as a diabetic over four years ago, he demonstrated good judgment and insight. Dr. Petro also estimated the claimant to be within the average range of intellectual functioning. (*Id.*, at 1). As of November 2011, mental health staff described the claimant's beliefs concerning his health status as "irrational." (Exhibit 17F, p. 66). Lastly, the claimant denies a history of suicidality, delusions or hallucinatory experiences, problems with anger or aggression, and homicidal attempts.

I do not fully credit the claimant's testimony because it is inconsistent with his routine and limited medical treatment history. I note for example that the claimant was discharged from mental health treatment on May 31, 2012. I also note that the claimant's last job ended for reasons unrelated to his health and that the claimant's receipt of unemployment benefits, while not dispositive, is some evidence that he considered himself able to do some work long after his alleged onset date and his amended onset date. (See Exhibit 3E).

. . .

In sum, the above residual functional capacity assessment is supported by the objective medical evidence, inconsistencies in the claimant's allegations of symptoms with the objective medical evidence, and the claimant's limited psychological treatment history.

TR 22.

In making this determination, the ALJ considered Plaintiff's reported daily activities and testimony, which he discussed as follows:

In activities of daily living, the claimant has mild restriction. For example, the claimant reported that he handles his own hygiene and self-care needs. (Exhibit 5F, p.5). He also indicated in a function report that he prepares his food, but does not cook on a stove top or hot surface; he washes clothes, washes dishes and vacuums floors. (Exhibit 5E, p.3). Lastly, the claimant noted that

he takes care of two small dogs by feeding them and providing water. (Exhibit 11E). While the claimant might experience some limitation in his ability to perform activities of daily living, the totality of the evidence supports no more than a mild degree of limitation in this domain.

. . .

The claimant testified that his feet, legs and hands get numb and hurt; and that he has lost feeling in his fingers and drops things. (Audio Hearing Record, at 2:39:22). He alleges experiencing two or three partial seizures each month. According to the claimant, the seizures last for about one minute and he feels drained for the next day or day and a half; however, he is not taking any seizure medications. He has had chest pain on several occasions and testified that he was unable to use continuous positive airway pressure (CPAP) machine to address the sleep apnea condition.

The claimant further testified that he can only sit for 45 minutes, stand for 45 minutes or walk for 20 minutes. He does not want to get out of bed in the morning, does not care about anything, avoids crowds, and forgets where he has left tools. The claimant stated that he was laid off from his last job with the Tennessee Valley Authority on April 15, 2009, and then received unemployment benefits, which ended about a year and a half prior to this hearing. (*See also* Exhibit 5D). While receiving unemployment benefits, the claimant asserted that he was able to work because he hoped he could return to work.

TR 17, 21 (*citing* TR 115, 133, 143, 167, 557, 559).[7]

---

[7] The ALJ questioned Plaintiff about receiving unemployment benefits at the hearing:

Q:  Do you remember being asked either in person or on forms that you filled out for unemployment benefits whether or not you were able to work?

A:  Yes, Your Honor. At first I was hopeful - - see I work out of the union hall and what they do, you don't go, have to go out and put in applications, you work out of the union hall. So I signed the books at the union hall and I was hopeful I could get my medical problems resolved and be able to go back to work. And I was willing to try to go back to work,

34

As can be seen, the ALJ's decision specifically addresses Plaintiff's testimony, daily activities, and subjective claims, indicating that these factors were considered. TR 17, 19-22. Additionally, as has been demonstrated here and in the statements of error above, the ALJ considered the record in its entirety, including the medical and testimonial evidence. It is clear from the ALJ's articulated rationale that, although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on evidence inconsistent with Plaintiff's allegations. This is within the ALJ's province.

After assessing all the objective medical evidence and testimony, the ALJ determined that Plaintiff's allegations were not fully creditable. TR 16-22. The ALJ observed Plaintiff during his hearing, assessed the records, and reached a reasoned decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, Plaintiff's claim fails.

---

and up until the neurologist said - - well, they told me not to be around water, ladders, heights, tight spaces, around water. Well a lot of that's what I do as an electrician. I mean I had to work off of ladders and out of lifts and things, different things. Up until that point and, Your Honor, I think - - I'm not sure exactly but I think it was the last part of 2010 or first part of 2011 - - and that's when I just took my name off the books at the union hall.

TR 44.

Plaintiff then testified that while he was working out of the union hall, Fox Sports called the union hall and offered work driving a camera truck and setting up for football games. TR 44-48. Plaintiff testified that he accepted this work on two occasions after April 2009 before taking his name off the union hall books. TR 48.

## 5. Function-by-Function Assessment

Plaintiff argues that the ALJ erred by failing to perform a function-by-function assessment when determining his RFC. Docket No. 14-1 at 10. Plaintiff notes that the "RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities" and involves both exertional and nonexertional factors. *Id.* (*citing* SSR 96-8p). Plaintiff argues that the seven exertional strength demands of sitting, standing, walking, lifting, carrying, pushing, and pulling must each be considered separately, but that the ALJ "failed to comport with this requirement." *Id.* (*citing* SSR 96-8p). Plaintiff contends that "the ALJ failed to include substantial limitations in the RFC finding correlating to symptoms and limitations which were well-documented in the record." *Id.* Plaintiff concludes that "the case should be remanded for further consideration and proper evaluation of the Plaintiff's RFC." *Id.*

Defendant contends that the ALJ's RFC analysis was proper, and notes that Plaintiff did "not indicate which specific limitations the ALJ omitted and the support therefor." *Id.* at 7. Defendant maintains that the ALJ specified the limitations he found supported by the medical evidence and record, and fully complied with the requirements of SSR 96-8p. *Id.* (*citing* TR 15-22; *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 729 (6th Cir. 2013)).

"Although a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing," as there is a difference "between what an ALJ must consider and what an ALJ must discuss in a written opinion. "*Beason v. Comm'r of Soc. Sec.*, 2014 WL 40463380, 13 (E.D. Tenn. 2014) (*quoting Delgado v. Comm'r of Soc. Sec.*, 30

Fed. Appx. 542, 547 (6th Cir. 2002)). Significantly, SSR 96-8p states that the ALJ must consider

each function separately; it does not state that the ALJ must discuss each function separately in

the narrative of the decision. The Sixth Circuit has held that an ALJ's RFC assessment complies

with SSR 96-8p so long as the RFC specifies the claimant's exertional and nonexertional

limitations. *Id.* In so doing, the ALJ need only explain how the evidence in the record supports

the RFC determination, discuss the claimant's ability to perform work related activities, and

explain the resolution to any inconsistences in the record. *Delgado*, 30 Fed. Appx. at 548.

The ALJ, after evaluating all of the objective medical evidence of record and Plaintiff's

testimony and reported level of activity, determined that Plaintiff retained the Residual

Functional Capacity to perform "light work as defined in 20 CFR 404.1567(b) except that he

cannot climb ladders; cannot more than occasionally climb stairs, balance, stoop, kneel, crouch

or crawl; must avoid all exposure to hazardous work environments; is limited to simple repetitive

work; cannot maintain attention or concentration for more that two hours without interruption;

and cannot have more than frequent interaction with others." TR 18. As shown above, the ALJ

discussed Plaintiff's exertional and nonexertional limitations and provided an explanation of how

the evidence in the record supports his conclusion. The regulations do not require more.

Plaintiff's claim that this action must be remanded because the ALJ failed to perform a function-

by-function assessment fails.

Additionally, although Plaintiff contends that "the ALJ failed to include substantial

limitations in the RFC finding correlating to symptoms and limitations which were well-

documented in the record," Plaintiff fails to identify which "substantial limitations" that "were

well-documented in record" the ALJ omitted beyond those arguments he raised in his earlier statements of error. As shown in the statements of error above, the ALJ properly evaluated the evidence and incorporated the restrictions he felt were consistent with, and supported by, the evidence of record. The ALJ's RFC determination was proper; remand is not warranted.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for "Judgment on the Administrative Record" be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

E. CLIFTON KNOWLES
United States Magistrate Judge